# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTIAN HARDING, PATRICIA GIRAMMA, RONALD WELCH and LISA HARBOUR, individually and on behalf of all others similarly situated, )))))) | **CLASS ACTION COMPLAINT** |
| Plaintiffs, )) | |
| v. )) | **CIVIL ACTION NO**.: |
| )) | |
| SOUTHCOAST HOSPITALS GROUP, INC., THE BOARD OF DIRECTORS OF SOUTHCOAST HOSPITALS GROUP, INC., THE INVESTMENT COMMITTEE OF SOUTHCOAST HOSPITALS GROUP and JOHN DOES 1-30. )))))))) | |
| Defendants. ) | |

## COMPLAINT

Plaintiffs, Christian Harding, Patricia Giramma, Ronald Welch and Lisa Harbour ("Plaintiffs"), by and through their attorneys, on behalf of the Southcoast Health System Partnership Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.   INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Southcoast Hospitals Group, Inc. ("Southcoast" or "Company"), the Board of Directors of Southcoast Hospitals Group, Inc. and its members during the Class

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Period ("Board") and the Investment Committee of Southcoast Hospitals Group, Inc. and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

2.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.   29 U.S.C. § 1104(a)(1)(B).  These twin fiduciary duties are "the highest known to the law." *Moitoso v. FMR LLC*, 451 F.Supp.3d 189, 204 (D. Mass. Mar. 27, 2020) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009).

3.     The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See, "A Look at 401(k) Plan Fees,"* *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b).[2]

---

[2] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

8.      Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

9.      At the end of 2019 and 2018, the Plan had over 886 million dollars and 740 million dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See,* the December 31, 2019 Report of Independent Auditor of the Southcoast Health System Partnership Plan ("2019 Auditor Report") at page 4.

10.      The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.     Plaintiffs allege that during the putative Class Period (December 14, 2014 through the date of judgment) Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's recordkeeping costs.

12.     Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan despite their lower fees.

13.     Because "the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

14.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

15.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.      JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29

U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of

ERISA, 29 U.S.C. § 1001, *et seq.*

17.     This Court has personal jurisdiction over Defendants because they transact business

in this District, reside in this District, and/or have significant contacts with this District, and

because ERISA provides for nationwide service of process.

18.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C.

§ 1132(e)(2), because some or all of the violations of ERISA occurred in this District and

Defendants reside and may be found in this District.  Venue is also proper in this District pursuant

to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the

events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     PARTIES

### Plaintiffs

19.      Plaintiff, Christian Harding ("Harding"), resides in New Bedford, Massachusetts.

During his employment, Plaintiff Harding participated in the Plan investing in the options offered

by the Plan and which are the subject of this lawsuit.

20.     Plaintiff, Patricia Giramma ("Giramma"), resides in Providence, Rhode Island.

During her employment, Plaintiff Giramma participated in the Plan investing in the options offered

by the Plan and which are the subject of this lawsuit.

21.     Plaintiff, Ronald Welch ("Welch"), resides in Manchester, New Hampshire.

During his employment, Plaintiff Welch participated in the Plan investing in the options offered

by the Plan and which are the subject of this lawsuit.

22.     Plaintiff, Lisa Harbour ("Harbour"), resides in West Wareham, Massachusetts. During her employment, Plaintiff Harbour participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

23.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

24.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes and information regarding the availability and pricing of separate accounts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

## Defendants

### Company Defendant

25.     Southcoast is the Plan sponsor with a principal place of business being 101 Page Street, New Bedford, Massachusetts, 02740. *See,* the December 31, 2019 Form 5500 of the Southcoast Health System Partnership Plan filed with the United States Department of Labor ("2019 Form 5500") at 1.

26.     Southcoast describes itself as health system "with multiple access points, offering an integrated continuum of health services throughout southeastern Massachusetts and Rhode Island.[3]"

27.     In addition to being the Plan sponsor, Southcoast also makes discretionary decisions each year with regard to contributions to the Plan. As detailed in the 2019 Auditor Report: "[t]he Company also contributes nonelective contributions to participants based on combined age and benefit service factors." 2019 Auditor Report at 5.

28.     The Company acted through its officers, including the Board and the Committee, and their members, to perform Plan-related fiduciary functions in the course and scope of their employment.

29.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

### **Board Defendants**

30.     The Company acted through the Board (defined above) to perform some of the Company's Plan-related fiduciary functions, including appointing and monitoring the activities of the Committee. *See*, the Retirement Plan Committee Charter as adopted by the Board of Directors of Southcoast Hospitals Group, Inc. on January of 2017 ("Charter") at 1.

31.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

---

[3] https://www.southcoast.org/about-southcoast-health last accessed on December 8, 2020.

32.    The unnamed members of the Board of Directors for Southcoast during the Class Period are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

33.    A discussed above, Southcoast and the Board appointed the Committee to oversee the Plan's investments.

34.    The Plan's Investment Policy Statement enumerates the responsibilities of the Committee. As described in the Investment Policy Statement, the Committee will purportedly "select and monitor each investment option on an ongoing basis." The Investment Policy Statement of the Southcoast Health System Partnership Plan Effective January of 2006 as Updated January of 2017 ("IPS") at 3. The Committee will also supposedly "periodically evaluate the investment results of the investment options. In addition to performance considerations, fund expenses will be considered in the selection and monitoring of investment alternatives." *Id.* As will be discussed below, the Committee fell well short of these fiduciary goals.

35.    The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

36.    The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Non-Defendant Fiduciary
SageView Advisory Group**

37.    Under the IPS, the  Committee is required to select an investment advisor to assist it with its fiduciary responsibilities.  As described in the IPS, the Committee must select and monitor each investment option for performance and excessive fees "with the assistance of such investment advisor as it shall select." *Id.*  As described in the 2020 minutes of the meetings of the

Committee, the Committee selected SageView Advisory Group to fulfill that responsibility. *See,* the 2020 Meeting Minutes of the Investment Committee of the Southcoast Hospitals Group, Inc.

38.     According to their website, SageView offers "a comprehensive process to analyze, monitor, track, and replace investments." https://www.sageviewadvisory.com/retirement-planning. In addition, SageView claims that it will "maintain compliance with ERISA and with the Universal Fiduciary Standards of Care." *Id.*

39.     Although SageView is a relevant party and has information relevant to this action, it is not named as a defendant given that Southcoast, the Board and the Committee ultimately remain responsible for the selection and monitoring of all investment options. Nonetheless, Plaintiffs reserve the right to name SageView as a defendant in the future if deemed necessary.

### **Additional John Doe Defendants**

40.     To the extent that there are additional officers, employees and/are contractors of Southcoast who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Southcoast officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

### IV.     CLASS ACTION ALLEGATIONS

41.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[4]

---

[4] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between December 14, 2014 through the date of judgment (the "Class Period").

42.     The members of the Class are so numerous that joinder of all members is impractical.  The 2019 Form 5500 filed with the Dept. of Labor lists 9,896 Plan "participants with account balances as of the end of the plan year."  2019 Form 5500 at p. 2.

43.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

44.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C.     Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

45.     Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

46.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

47.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

48.     As stated in the Plan's IPS, Southcoast established the Plan "to provide a retirement savings program for eligible employees of Southcoast Health System, Inc. and its subsidiaries." IPS at 2.

49.     The Plan is a 403(b) Plan, which serves the same purpose as a 401(k) plan: a vehicle for retirement savings.  Most participants in defined contribution plans like 401(k) or 403(b) plans expect that their accounts will be their principal source of income after retirement.  Although at all

times accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

50.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *See,* the Plan Document of the Southcoast Health System Partnership Plan as Amended and Restated on September 1, 2017 ("Plan Doc.") at 56.

### Eligibility

51.     As described in the 2019 Auditor Report: "[t]he Plan is a defined contribution plan covering substantially all employees of Southcoast Hospitals Group, Inc. and participating employers … ."  2019 Auditor Report at 5.

### Contributions

52.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions. *Id.*

53.     With regard to employer contributions, Southcoast "contributes a fixed matching contribution at a rate of 100% of the first 6% of each eligible participant's compensation that is contributed by the participant to the Plan." *Id.* With regard to contributions made directly by

participants with no employer matching contribution, participants "may contribute up to 85% of their plan compensation on a pre-tax basis, subject to Internal Revenue Code ("IRC") limitations." *Id.*

54.     Southcoast, at its discretion, may make nonelective contributions to the Plan. As described in the 2019 Auditor Report, Southcoast authorized "nonelective contributions [of] $8,539 in 2019." *Id.*

55.     Like other companies that sponsor defined contribution plans for their employees, Southcoast enjoys both direct and indirect benefits by providing matching contributions to Plan participants.  Employers are generally permitted to take tax deductions for their contributions to defined contribution plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

56.     Southcoast also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover."  *See* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

57.     Given the size of the Plan, Southcoast likely enjoyed a significant tax and cost savings from offering a match.

***Vesting***

58.     A participant is 100 percent vested at all times in their contributions plus actual earnings thereon.  2019 Auditor Report at 5. However, matches made by Southcoast are not considered fully vested until after 2 years of regular full-time employment. *Id.*

***The Plan's Investments***

59.     As described below, several funds were available to Plan participants for investment each year during the putative Class Period. Plan assets grew incrementally during the

Class Period. By December 31, 2019, the Plan's assets under management were over $886,000,000. *See,* 2019 Auditor Report at 3.

## VI. THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

60.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

61.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

62.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

### A.  Defendants Lacked a Prudent Fiduciary Process to Evaluate the Plan's Fees

63.     In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans.  This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [5]

---

[5] *See https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf* ("DOL 408(b)(2) Regulation Fact Sheet")

64.     The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

65.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services.  Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers."  DOL 408(b)(2) Regulation Fact Sheet.

66.     Investment options have a fee for investment management and other services.  With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

67.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage."  "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[6]

---

[6] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

68.     Fiduciaries "should develop and follow a deliberative process for evaluating the reasonableness of fees.   This includes understanding the sources, amounts, and nature of recordkeeping and investment management fees paid by the plan.   Under DOL fee disclosure regulation, [fiduciaries] should be sure they receive service and fee information from each covered service provider, and they should diligently review this information as part of the reasonableness evaluation process." *Id.*

69.     "[Fiduciaries] must understand the content of the fee disclosure materials received from service providers.   If the disclosure is not clear, or if the plan sponsor believes the information is incomplete, they must request additional information or clarification.   Additionally, the plan sponsor may have an obligation to inquire as to the availability of lower-cost investment alternatives, such as lower-cost share classes for mutual funds or the availability of collective trusts."  Best Practices for Plan Fiduciaries," at 36.

70.     For purposes of evaluating expense ratios of an investment, plan fiduciaries should obtain competitive pricing information (*i.e.*, fees charged by other comparable investment funds to similarly situated plans).   This type of information can be obtained through mutual fund data services, such as Morningstar, or with the assistance of the plan's expert consultant.   However, for comparator information to be relevant for fiduciary purposes, it must be consistent with the size of the plan and its relative bargaining power.   Large plans for instance are able to qualify for lower fees on a per participant basis, and comparators should reflect this fact.

71.     According to Vanguard, "[b]enchmarking is one of the most widely used supplements to fee disclosure reports and can help plan sponsors put into context the information contained in the reports."  "Best Practices for Plan Fiduciaries," at 37.

72.     "The use of third-party studies provides a cost-effective way to compare plan fees with the marketplace. Plan sponsors may elect to engage a consultant to assist in the benchmarking

process.  For a fee, consultants can give plan sponsors a third-party perspective on quality and costs of services.  It is important to understand the plan (*e.g.,* plan design, active or passive investment management, payroll complexities, etc.) as it relates to the benchmarking information in order to put the results in an appropriate context.  By understanding all of the fees and services, a plan sponsor can make an accurate 'apples-to-apples' comparison." *Id.*

73.     When conducting fiduciary reviews of the plan's investment menu, plan fiduciaries should document the relevant information gathered and considered for purposes of the investment review, as well as supporting evidence for any decision to continue or change investment options. *See* "Best Practices for Plan Fiduciaries," at 36 ("Plan sponsors should build a record to document the information and factors used to determine the reasonableness of plan fees.")

74.     Documentation of fiduciary reviews is generally accomplished in the form of meeting minutes. These minutes do not necessarily need to be lengthy, but they should describe the (i) fiduciary topics discussed, (ii) type of investment information considered for the fiduciary review, and (iii) the rationale for resulting investment decisions.  Any related documents or data considered for purposes of the investment review (*e.g.*, prospectuses, plan investment reports, market data, etc.) should be included as attachments to the meeting minutes or otherwise memorialized.  Without proper documentation of the investment decision-making process, plan fiduciaries are open to the charge that their decisions were made in an imprudent or conflicted manner.

75.     Plaintiffs have reviewed the Committee's quarterly meeting minute beginning in November of 2019 to the present. While meeting minutes from the remainder of the Class Period were requested, Southcoast declined to provide them. However, a review of the meeting minutes provided demonstrates that the Committee did not follow best practices and indeed failed to employ a prudent process in monitoring investment management fees for the Plan's investments.

76.     In fact, the only discussion relating to the performance and the expense of the funds in the Plan related to the fact that the Committee had made some changes to the fund line up with an effective date of January 1, 2020. However, a careful review of the fund line up in place in 2019 against the fund lineup as of June 1, 2020 reveals that at least 3 of the underperforming excessively expensive funds with significant assets were not replaced at the beginning of 2020. Had the Committee prudently undertaken its fiduciary responsibilities, those 3 funds would have been replaced. The 3 high cost underperforming funds are: ClearBridge Appreciation IS, Parnassus Core Equity Investor and Pioneer Short Term Income Y. All three funds housed more the 68 million dollars in 2019.

77.     The Committee did not document any effort to give adequate attention to the high investment management fees charged or the poor performance by several of the Plan's investments. As described in the next section, the investment management fees charged by a majority of the Plan's funds were in excess of the median and average fees of identical and comparable funds in similarly-sized plans.  These fees were unreasonable because the Plan had significant size to negotiate for lower fees.

78.     Materials reviewed at the Committee meetings focused primarily on changes to the fund line up in 2020 but, as discussed above, none of the 3 higher cost underperforming funds were replaced, as will be discussed below.  The Committee did not meaningfully review the investment management fees charged for the Plan's investments as indicated by the ***absence*** of discussions in meeting minutes about these fees or any ***benchmarks*** regarding what the Plan's fees should be.

79.     There is also no documentation to indicate the Committee investigated whether the actively managed mutual funds in the Plan's investment lineup provided sufficiently greater benefits over available fund alternatives to offset the higher costs of the actively managed funds.

Nor is there evidence that the Committee ever conducted a Plan-wide comparison of the Plan's actively managed mutual funds with alternative funds that were available to the Plan. The Committee's failure to meaningfully consider replacing the Plan's actively managed mutual fund options resulted in Plan participants paying much higher investment fees than was necessary.

80.     This lack of focus on fees is particularly egregious because it violated the terms of the IPS which states that the Committee will: "periodically evaluate the investment results of the investment options. In addition to performance considerations, fund expenses will be considered in the selection and monitoring of investment alternatives." IPS at 3.

81.     With regard to recordkeeping fees, the Plan's fiduciaries fared no better in their fee review process. In fact, there is no mention in the meeting minutes reviewed of the Plan's high administrative and recordkeeping fees. As discussed *infra*, the Plan's fiduciaries could have obtained a reasonable recordkeeping rate by the start of the Class Period had the fiduciaries engaged in prudent conduct. The Plan's participants would have been spared excess recordkeeping costs.

82.     Based on reasonable inferences from these facts, as well as others set forth below, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options.

83.     In sum, Defendants failed to leverage the size of the Plan to negotiate for: (1) lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period; and (2) a prudent payment arrangement with regard to the Plan's recordkeeping and administrative fees.

**B.      The Totality of Circumstances Demonstrate that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner**

> **(1)      There Was Little to No Change in Plan Investment Options for the Entirety of the Class Period**

84.      One indication of Defendants' failure to prudently monitor the Plan's funds is that the Plan has retained many funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with identical, comparable and/or superior alternatives, and despite ample evidence available to a reasonable fiduciary that the costs associated with these funds were imprudently high.  These funds in the Plan stayed unchanged from 2014 to 2018:

| 2018 Funds | Years in the Plan |
|---|---|
| RWMFX $ 143,163,728<br>American Funds Washington Mutual R5 | Since 2014 |
| MWTRX $ 75,369,911<br>Metropolitan West Total Return Bd M | Since 2014 |
| RERFX $ 43,441,017<br>American Funds Europacific Growth R5 | Since 2014 |
| LMESX $ 39,154,929<br>ClearBridge Appreciation IS | Since 2014 |
| BPRIX $ 25,292,916<br>BlackRock Inflation Protected Bond Instl | Since 2014 |
| PSHYX $ 14,728,467<br>Pioneer Short Term Income Y | Since 2014 |
| PRBLX $ 14,203,453<br>Parnassus Core Equity Investor | Since 2014 |
| FBNRX $ 10,441,651<br>Templeton Global Bond R6 | Since 2014 |

85.      Failure to remove or change imprudent funds to cheaper share classes or cheaper cost structures over the course of several years is a clear indication that Defendants were not monitoring the Plan's funds as they should have been.

> **(2)      Many of the Plan's Funds Had Investment Management Fees In Excess of Fees for Funds in Similarly-Sized Plans**

86.      Another indication of Defendants' failure to prudently monitor the Plan's funds is that several funds during the Class Period were more expensive than comparable funds found in similarly sized plans (plans having between $500m and $1b in assets).  The Plan grew from

$596,392,522 to $647,449,620 in assets from 2015 to 2016. By the end of 2019, the Plan had $866,629,968 in assets.

87.    In 2018, at least 7 out of 19, or more than 36% of Plan funds were more expensive than comparable funds found in similarly sized plans.  The expense ratios for funds in the Plan in some cases were up to ***123%*** (in the case of the Carillon Eagle Mid Cap Growth A) above the median expense ratios in the same category: [7]

| ICI Median | | | |
|---|---|---|---|
| **2018 Fund** | **2019 Exp. Ratio** | **Investment Style** | **ICI Median**[8] |
| MWTRX $ 75,369,911<br>Metropolitan West Total Return Bd M | 0.67% | Domestic Bond | 0.43% |
| LMESX $ 39,154,929<br>ClearBridge Appreciation IS | 0.57% | Domestic Equity | 0.47% |
| BPRIX $ 25,292,916<br>BlackRock Inflation Protected Bond Instl | 0.65% | Domestic Bond | 0.43% |
| HAGAX $ 17,915,960<br>Carillon Eagle Mid Cap Growth A | 1.05% | Domestic Equity | 0.47% |
| PSHYX $ 14,728,467<br>Pioneer Short Term Income Y | 0.46% | Domestic Bond | 0.43% |
| PRBLX $ 14,203,453<br>Parnassus Core Equity Investor | 0.86% | Domestic Equity | 0.47% |

88.    The high cost of the Plan's funds is even more stark when comparing the Plan's funds to the average fees of funds in similarly-sized plans:

---

[7] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 403(b) Plans, 2016* at 55 (April 2020) (hereafter, "ICI Study") available at https://www.ici.org/pdf/20_ppr_dcplan_profile_403b.pdf

[8] This median fee is taken from the ICI Study for plans with $500m to $1b in assets.

| ICI Average | | | |
|---|---|---|---|
| **2018 Fund** | **2019 Exp. Ratio** | **Investment Style** | **ICI Average** |
| MWTRX $ 75,369,911<br>Metropolitan West Total Return Bd M | 0.67% | Domestic Bond | 0.36% |
| LMESX $ 39,154,929<br>ClearBridge Appreciation IS | 0.57% | Domestic Equity | 0.44% |
| BPRIX $ 25,292,916<br>BlackRock Inflation Protected Bond Instl | 0.65% | Domestic Bond | 0.36% |
| HAGAX $ 17,915,960<br>Carillon Eagle Mid Cap Growth A | 1.05% | Domestic Equity | 0.44% |
| PSHYX $ 14,728,467<br>Pioneer Short Term Income Y | 0.46% | Domestic Bond | 0.36% |
| PRBLX $ 14,203,453<br>Parnassus Core Equity Investor | 0.86% | Domestic Equity | 0.44% |
| FBNRX $ 10,441,651<br>Templeton Global Bond R6 | 0.56% | International Bond | 0.42% |

89.     Although a good gauge of Defendants' imprudence, median-based and average-based comparisons still understate the excessiveness of the investment management fees of the Plan funds because many prudent alternative funds were available (which Defendants failed to consider) that offered lower expenses than the median and average fees.

### (3)     Several of the Plan's Funds Were Not in the Lowest Fee Share Class Available to the Plan

90.     Another fiduciary breach stemming from Defendants' flawed investment monitoring system resulted in the failure to identify available lower-cost share classes of many of the funds in the Plan during the Class Period.

91.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.  Because the institutional share

classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.  *Tibble*, 2017 WL 3523737, at * 13.

92.     Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets. Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for large plans like the Plan.  *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24).

93.     Here, there were 5 funds that were not in the lowest share class from 2014 to 2018. The total assets under management for all 5 funds was more than 294 million dollars thus easily qualifying them for lower share classes.  The following is a list of these 5 funds and their assets under management as of the end of 2018:

| 2018 Fund | 2018 Assets Under Management |
|---|---|
| RWMFX<br>American Funds Washington Mutual R5 | $143,163,728 |
| MWTRX<br>Metropolitan West Total Return Bd M | $75,369,911 |
| RERFX<br>American Funds Europacific Growth R5 | $43,441,017 |
| HAGAX<br>Carillon Eagle Mid Cap Growth A | $17,915,960 |
| PRBLX<br>Parnassus Core Equity Investor | $14,203,453 |

94.     In several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds.

95.     The below chart uses 2020 expense ratios to demonstrate cost differentials between the applicable mutual funds and the cheaper identical shares:

| 2018 Fund | 2020 ER | Alt Fund | 2020 ER | Excess Expense |
|---|---|---|---|---|
| RWMFX $ 143,163,728 American Funds Washington Mutual R5 | 0.32 % | RWMGX American Funds Washington Mutual R6 | 0.27 % | 19% |
| MWTRX $ 75,369,911 Metropolitan West Total Return Bd M | 0.67 % | MWTIX Metropolitan West Total Return Bd I | 0.44 % | 52% |
| RERFX $ 43,441,017 American Funds Europacific Growth R5 | 0.51 % | RERGX American Funds Europacific Growth R6 | 0.46 % | 11% |
| HAGAX $ 17,915,960 Carillon Eagle Mid Cap Growth A | 1.05 % | HRAUX Carillon Eagle Mid Cap Growth R6 | 0.65 % | 62% |
| PRBLX $ 14,203,453 Parnassus Core Equity Investor | 0.86 % | PRILX Parnassus Core Equity Institutional | 0.63 % | 37% |

96.     Some of the funds listed above were finally transitioned to lower-share classes in 2019, including: American Funds Washington Mutual R5 and American Funds Europacific Growth R5. Also, the Plan changed to the Institutional version of the Parnassus Core Equity fund in the third quarter of 2020. These changes were too little to late as the lost savings to plan participants had already been baked in. The Plan should have changed to the lower share classes as soon as they were available but by no later than the beginning of the Class Period.

97.     The above is for illustrative purposes only.  At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

98.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  Because the more expensive share

classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds *could not have* (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility. In short, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

99.     In other words, given the size of the Plan, Defendants made investments with higher costs (higher expense ratios) available to participants while the same investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received. This reduced the likelihood that Plan participants would achieve their preferred lifestyle in retirement.

100.     It is not prudent to select higher cost versions of the same fund even if a fiduciary believes fees charged to plan participants by the "retail" class investment were the same as the fees charged by the "institutional" class investment, net of the revenue sharing paid by the funds to defray the Plan's recordkeeping costs. *Tibble*, 2017 WL 3523737, at * 8. Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing." *Id.* at * 11. This lack of good fiduciary practice resonates loudly in this case especially where the recordkeeping and administrative costs were excessive and were paid for through an imprudent process.

### (4)     The Plan's Recordkeeping and Administrative Costs Were Excessive During the Class Period

101.     Another result of Defendants' imprudent process was the excessive recordkeeping and administrative fees Plan participants were required to pay during the Class Period.

102.     Long-standing DOL guidance explicitly states that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process

for selecting … service providers" and "monitor … service providers once selected to see that they continue to be appropriate choices."  *See, "A Look at 401(k) Plan Fees," supra*, at n.3.

103.    The Restatement of Trusts also puts cost-conscious management above all else while administering a retirement plan.  *Tibble*, 843 F.3d at 1197-98.

104.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

105.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it is devastating for Plan participants.  "At worst, revenue sharing is a way to hide fees.  Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at   http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

106.    In this matter, using revenue sharing to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees.

107.    As demonstrated in the chart below, the Plan's per participant administrative and recordkeeping fees were astronomical when benchmarked against similar plans.

|      | Participants | TransAm Direct | TransAm Indirect | Total Cost  | $PP  |
|------|--------------|----------------|------------------|-------------|------|
| 2014 | 7243         | $224,778       | $528,315         | $753,093    | $104 |
| 2015 | 8602         | $612,789       | $542,389         | $1,155,178  | $134 |
| 2016 | 8963         | $648,338       | $373,482         | $1,021,820  | $114 |
| 2017 | 9385         | $664,601       | $431,785         | $1,096,386  | $117 |
| 2018 | 9383         | $667,436       | $521,563         | $1,188,999  | $127 |
| 2019 | 9896         | $636,242       | $410,480         | $1,046,722  | $106 |

108.    By way of comparison, we can look at what other plans paid for recordkeeping and administrative costs during the same time period.

109.    The Plan had between 5,000 and 10,000 participants making it eligible for some of the lowest fees on the market.

110.    NEPC, a consulting group, which recently conducted its 14th Annual Survey titled the NEPC 2019 Defined Contribution Progress Report, which took a survey of various defined contribution plan fees.[9]  The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other. The average plan had $1.1 billion in assets and 12,437 participants.  The median plan had $512 million in assets and 5,440 participants.  *See* Report at 1.

111.    NEPC's survey found that the majority of plans with between 5,000 and 10,000 participants paid slightly over $50 per participant recordkeeping, trust and custody fees.  Report at 10.  **No plan** with between 5,000 and 10,000 participants paid more than $90 per participant for recordkeeping.  *Id.*

112.    Another data source, the *401k Averages Book* (20th ed. 2020)[10] studies plan fees for smaller plans, those under $200 million in assets.  Although it studies smaller plans than the

---

[9] Available at https://www.nepc.com/insights/2019-dc-plan-and-fee-survey.

[10] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information."  *401k Averages Book* at p. 2.

Plan, it is nonetheless a useful resource because we can extrapolate from the data what a bigger plan like the Plan should be paying for recordkeeping. That is because recordkeeping and administrative fees should ***decrease*** as a plan increases in size. For example, a plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant. *401k Averages Book* at p. 95. A plan with 2,000 participants and $200 million in assets has an average recordkeeping and administration cost (through direct compensation) of $5 per participant. *Id.*, at p. 108. Thus, the Plan, with between $500 million and $1 billion dollars in assets and over 8,000 participants throughout the Class Period should have had direct recordkeeping costs below the $5 average, which it clearly did not.

113.    Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

114.    Additionally, because Plan participants were paying more for recordkeeping than they should have as a result of the Plan fiduciaries' conduct, this confirms that the use of higher-cost share classes cannot be justified as a prudent means to pay recordkeeping and administrative costs.

115.    By failing to investigate the availability of certain identical lower share classes of the same funds, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

116.    Moreover, because a significant amount of the recordkeeping and administrative fees were paid for by forfeiture accounts there was no need to use revenue sharing from the Plan's investments to pay for recordkeeping and administrative fees. But there is no indication that the Plan's fiduciaries returned the revenue sharing collected from the Plan's investments back to the Plan's participants as they should have.

117.    Indeed, the Plan's fiduciaries acknowledge their imprudent conduct by switching some of the Plan's funds during 2019 and in 2020 to funds that had no revenue sharing attached to them.

118.    By failing to investigate the use of lower cost share classes, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.  Further, to the extent Defendants failed to return revenue sharing amounts back to Plan participants, this was a further fiduciary breach that cost Plan participants.

### (5)    Many of the Funds in the Plan had Lower Cost Better Performing Active Alternatives

119.    The Plan failed to replace 9 of the higher cost and underperforming funds which in 2018 housed over 373 million dollars in participant assets. These funds had nearly identical lower cost alternatives during the Class Period. These funds are what's known as actively managed funds. As detailed in a well-respected investment journal: "[a]n actively managed investment fund is a fund in which a manager or a management team makes decisions about how to invest the fund's money.[11]" Thus, the success or failure of an actively managed fund is linked directly to the abilities of the managers involved.

120.    Here, the performance managers of the funds in the Plan fell well short of acceptable industry standards and they should have been replaced at the beginning of the Class Period or sooner. Failure to do so, cost the Plan and its participants millions of dollars in lost opportunity and revenue.

121.    There were several superior performing less expensive alternatives available during the Class Period which should have been selected by the Plan.

---

[11] https://www.thebalance.com/actively-vs-passively-managed-funds-453773 last accessed on November 12, 2020.

122.    The chart below choses one of these superior performing alternatives for each fund

in the Plan during 2018 and compares them to the underperforming funds in the Plan:

| 2018 Fund | 2020 Exp Ratio | Active Lower Cost Alternative | 2020 Exp Ratio | % Fee Excess |
|---|---|---|---|---|
| RWMFX $ 143,163,728 American Funds Washington Mutual R5 | 0.32% | DFUSX DFA US Large Company I | 0.08 % | 300% |
| MWTRX $ 75,369,911 Metropolitan West Total Return Bd M | 0.67% | BBTBX Bridge Builder Core Bond | 0.14 % | 379% |
| RERFX $ 43,441,017 American Funds Europacific Growth R5 | 0.51% | VWILX Vanguard International Growth Adm | 0.32 % | 59% |
| LMESX $ 39,154,929 ClearBridge Appreciation IS | 0.57% | GESSX GE RSP US Equity | 0.14 % | 307% |
| BPRIX $ 25,292,916 BlackRock Inflation Protected Bond Instl | 0.65% | DIPSX DFA Inflation-Protected Securities I | 0.11 % | 490% |
| HAGAX $ 17,915,960 Carillon Eagle Mid Cap Growth A | 1.05% | FMGGX Franklin Small-Mid Cap Growth R6 | 0.50 % | 110% |
| PSHYX $ 14,728,467 Pioneer Short Term Income Y | 0.46% | VFSTX Vanguard Short-Term Investment-Grade Inv | 0.20 % | 130% |
| FBNRX $ 10,441,651 Templeton Global Bond R6 | 0.56% | Invesco World Bond R6 | 0.29 % | 123% |
| PRBLX $ 14,203,453 Parnassus Core Equity Investor | 0.86% | MUIGX Nationwide Dynamic US Growth R6 | 0.50 % | 72% |

123.    Not only are the fees excessive as compared to their similar lower cost alternatives

but the suggested alternative funds outperformed all seven funds significantly. The difference

between the excessive fees paid for these underperforming funds and the suggested alternatives

represent more lost savings each year for plan participants and have been compounded over the

years. The underperformance of these 9 funds as compared to the suggested alternatives is represented in the chart below:

| 2018 Fund | Benchmark | Active Lower Cost Alternative | Benchmark Relative | | |
|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y |
| American Funds Washington Mutual R5 | iShares Russell 1000 Value ETF | | 9.51% | 5.64% | 4.29% |
| | | DFA US Large Company I | 20.27% | 9.74% | 6.61% |
| Metropolitan West Total Return Bd M | iShares Core U.S. Aggregate Bond ETF | | 0.96% | 0.34% | 0.11% |
| | | Bridge Builder Core Bond | 0.74% | 0.51% | 0.56% |
| American Funds Europacific Growth R5 | iShares MSCI EAFE Growth ETF | Vanguard International Growth Adm | 1.94% | -1.13% | 0.13% |
| | | | 36.35% | 9.31% | 9.68% |
| ClearBridge Appreciation IS | iShares Russell 1000 ETF | | -4.00% | -0.04 | -0.65% |
| | | GE RSP US Equity | 5.87% | 1.65% | 0.71% |
| BlackRock Inflation Protected Bond Instl | iShares TIPS Bond ETF | DFA Inflation-Protected Securities I | 1.43% | 0.12% | 0% |
| | | | 0.72% | 0.32% | 0.21% |
| Carillon Eagle Mid Cap Growth A | iShares Russell Mid-Cap Growth ETF | Franklin Small-Mid Cap Growth R6 | 3.47% | 0.76% | 1.37% |
| | | | 21.22% | 5.03% | 1.58% |
| Pioneer Short Term Income Y | Vanguard Short-Term Bond ETF | Vanguard Short-Term Investment-Grade Inv | -4.43% | -1.31% | -0.55% |
| | | | -0.12% | 0.11% | 0.50% |

| 2018 Fund | Benchmark | Active Lower Cost Alternative | Benchmark Relative | | |
|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y |
| Templeton Global Bond R6 | AdvisorShares FolioBeyond Smt Cor Bd ETF | Invesco World Bond R6 | -5.16% | -4.39% | 2.43% |
| | | | 5.61% | 1.43% | 0.72% |
| Parnassus Core Equity Investor | iShares Russell 1000 ETF | Nationwide Dynamic US Growth R6 | 0.14% | 2.28% | -0.02% |
| | | | 0.86% | 3.63% | 1.25% |

124.    Two of the funds in the Plan, discussed above, had some of the worst performance histories of all their peers. The Templeton Global Bond R6 was worse than 84% of its 320 peers at the one year mark, 89% worse than 293 of its peers at the 3 year mark and 81% worse than 276 of its peers at the 5 year mark. The Pioneer Short Term Income Y performed worse than 96% of its 587 peers at the 1 year mark and 83% worse that its 545 peers at the 5 year mark.

125.    As detailed in the chart above, the comparator funds in the chart easily outperformed the funds in the Plan at the 1, 3 and 5 year marks. A prudent fiduciary should have been aware of these better preforming lower cost alternative and switched to them at the beginning of the Class Period.  Failure to do so is a clear indication that the Plan lacked any prudent process whatsoever for monitoring the cost and performance of the funds in the Plan.

## FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duty of Prudence
### (Asserted against the Committee)

126.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

127.    At all relevant times, the Committee and its members and Southcoast ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

128.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

129.     The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants.  Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.  The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.  In addition, the Prudence Defendants failed to timely investigate lower cost and better performing actively managed funds as alternatives to the actively managed mutual funds in the plan.

130.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

131.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

132.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendants' own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

### SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against Southcoast and the Board Defendants)

133.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

134.    Southcoast and the Board (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

135.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

136.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

137.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)    failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes; and

(c)    failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

138.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had the Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

139.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

140.    **WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of

an independent fiduciary or fiduciaries to run the Plan and removal of Plan

fiduciaries deemed to have breached their fiduciary duties;

I.       An award of pre-judgment interest;

J.       An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the

common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.


Dated:  December 14, 2020          **PLAINTIFFS**
**CHRISTIAN HARDING, PATRICIA GIRAMMA,**
**RONALD WELCH and LISA HARBOUR, individually**
**and on behalf of all others similarly situated,**

/s/ *Jeffrey Hellman*
Jeffrey Hellman
BBO # 549896
**Law Offices of Jeffrey Hellman, LLC**
195 Church Street, 10th Floor
New Haven, CT  06510
Tel.: 203-691-8762
Fax: (203) 823-4401
jeff@jeffhallmanlaw.com

**CAPOZZI ADLER, P.C.**

/s/ Donald R. Reavey                    .
Donald R. Reavey, Esquire
(*Admission Pro Hac Vice to be Requested*)
PA Attorney ID #82498
2933 North Front Street
Harrisburg, PA 17110
donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

/s/ Mark K. Gyandoh                    .
Mark K. Gyandoh, Esquire
(*Admission Pro Hac Vice to be Requested*)
PA Attorney ID # 88587
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road

Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class